Affirmed and Majority and Concurring Opinions filed September 30, 2004









Affirmed and Majority and Concurring Opinions filed
September 30, 2004.

 

 

In The

 

Fourteenth Court of Appeals

____________

 

NO. 14-03-00508-CV

____________

 

STEPHEN
G. RUDISILL, RONALD B. COOLLEY, AND 

SLAWOMIR Z. SZCZEPANSKI, Appellants

 

V.

 

ARNOLD
WHITE & DURKEE, P.C., Appellee

_______________________________________________________

 

On Appeal from the 189th District Court

Harris County, Texas

Trial Court Cause No. 00-47589

_______________________________________________________

 

C O N C U R R I N G   O P I N I O N








Texas, like most other states,
affords shareholders both the right to approve transactions that are not in the
usual and regular course of the corporation=s
business[1]
and the right to seek an appraisal remedy and fair value for their shares if
they vote against such a transaction and it is nevertheless effected.[2]  Texas, however, is unique in defining Ausual and
regular course of business@ in a way
that includes the most unusual, irregular, and extraordinary events in the life
of a corporation.  Texas= singular
definition of this well-worn term in article 5.09(B) of the Texas Business
Corporation Act[3]
effectively eliminates the necessity for shareholder approval in many
transactions that, in common parlance and understanding, would never be considered
in the Ausual and
regular course of business.@ 

Under Texas= unique
statutory scheme, a corporation is given great latitude to structure a sale of
all or substantially all of its assets in a way that does not require
shareholder approval.  As a result,
minority shareholders are vulnerable to the actions of majority shareholders,
who may freely configure a transaction effecting a fundamental corporate change
in a way that avoids triggering the statutory shareholder protections.  As illustrated in this case, shareholders can
easily lose their ability to vote on a fundamental corporate change and their
opportunity to benefit from an appraisal remedy.  Although this statutory scheme may seem
unfairly weighted against dissenting shareholders, this is the considered
policy choice of the Texas Legislature, and we must construe the statute in
accordance with the Legislature=s
intent.  

The Legislature=s intent, though not clear on the face of
the statute, is apparent after application of the appropriate rules of
statutory construction:  A sale of all
or substantially all of a corporation=s assets is deemed to be in the Ausual and regular course of business@ as long as the corporation engages,
directly or indirectly, in some business after the sale B even if the corporation did not engage in
that business before the sale.  








The court is correct to conclude
that appellee Arnold White & Durkee, P.C. continued to engage in business
after selling substantially all of its assets, but the court need not determine
whether the law firm=s passive
receipt of income as a partner in the newly created Howrey Simon Arnold &
White, L.L. P. (AHowery
Simon@)
constitutes engaging, directly or indirectly, in the legal services business.  As explained below, article 5.09(B) does not
require a corporation to engage in the same business after the asset sale for
the transaction to qualify as one consummated in the Ausual and
regular course of business.@  Because Arnold White & Durkee continued
in some business after the asset sale, shareholder approval was not
required for this transaction. 
Therefore, appellants Stephen G. Rudisill, Ronald B. Coolley, and
Slawomir Z. Szczepanski (collectively referred to as the AShareholders@) cannot
prevail and the court is correct to overrule the issues they raise on
appeal.  Though I do not embrace all of
the majority=s reasoning, I respectfully
concur in the court=s
judgment.

Statutory Construction

Is article 5.09(B) ambiguous?

 

The majority does not address
whether article 5.09(B) is ambiguous.  As
a threshold matter, the court should examine the text of the statute and
determine if it is ambiguous.  See In
re Mo. Pac. Ry. Co., 998 S.W.2d 212, 217 (Tex. 1999).  Under article 5.09, the board of directors
generally has the power to sell all or substantially all of the corporation=s assets
without shareholder approval only if the sale is in the usual and regular
course of the corporation=s
business:

A.  Except as otherwise provided in the articles
of incorporation and except as provided in the next sentence of this section,
the sale, lease, exchange or other disposition of all, or substantially all,
the property and assets of a corporation, when made in the usual and regular
course of the business of the corporation, may be made upon such terms and
conditions and for such considerations, which may consist in whole or in part
of money or property, real or personal, including shares of any other
corporation, domestic or foreign, as shall be authorized by its board of
directors, without authorization or consent of the shareholders.  Except as otherwise provided in the articles
of incorporation, the board of directors may authorize any pledge, mortgage,
deed of trust or trust indenture and no authorization or consent of the
shareholders shall be required for the validity thereof or for any sale
pursuant to the terms thereof.








B.  A transaction referred to in this Article
and in Article 5.10 of this Act shall be in the usual and regular course of
business if the corporation shall, directly or indirectly, either continue to
engage in one or more businesses or apply a portion of the consideration
received in connection with the transaction to the conduct of a business in
which it engages following the transaction.

Tex.
Bus. Corp. Act art. 5.09 (emphasis added).

In 1987, the Texas Legislature
added article 5.09(B), which sets forth the circumstances under which a sale of
all or substantially all of a corporation=s assets
is in the Ausual and regular course of
business.@ 
See Act of April 30, 1987, 70th Leg., R.S., ch. 93, ' 25, 1987
Tex. Gen.  Laws 203, 221 (codified at Tex. Bus. Corp. Act art. 5.09(B)).  If a sale of all or substantially all of a
corporation=s assets does not occur in the
usual and regular course of its business under article 5.09(B), then article
5.10 requires the approval of the transaction by at least two-thirds of the
corporation=s shareholders.  See Tex.
Bus. Corp. Act art. 5.09, 5.10. In this event, shareholders who do not
vote their shares in favor of such a transaction and who follow the
appraisal-remedy procedures outlined in article 5.12 are entitled to receive
payment from the corporation for the fair value of their shares.  See Tex.
Bus. Corp. Act art. 5.11, 5.12. 
If the sale is in the usual and regular course of the corporation=s
business, then shareholders do not get the benefit of any appraisal
remedy.  See Tex. Bus. Corp. Act art. 5.09B5.11.








The Shareholders assert that a
sale of all or substantially all of a corporation=s assets
is not in the usual and regular course of the corporation=s
business under article 5.09(B) if the corporation does not continue in one or
more of the businesses that it conducted before the asset sale.  Based on the text of the statute, this
construction is reasonable because article 5.09(B) uses the language Acontinue
to engage in one or more businesses,@ which
logically could be interpreted to mean continuing to engage in at least one
business that the corporation had engaged in before the sale.  See Tex.
Bus. Corp. Act art. 5.09(B). 
Furthermore, it is reasonable to require shareholder approval and to
protect dissenting shareholders with an appraisal remedy when the nature of the
corporation=s business is being completely
transformed.  

The phrase Acontinue
to engage in one or more businesses@ connotes
a carrying on of the business and its activities.  Indeed, looking to the plain meaning of the
word Acontinue,@ it is
reasonable to conclude that the Legislature did not intend a cessation of the
corporation=s regular business activity but
rather to keep up the activity already begun. 
See Webster=s Third New International Dictionary 493
(1993 ed.) (defining Acontinue@ as Ato be
steadfast or constant in a course or activity : keep up or maintain esp.
without interruption a particular condition, course, or series of actions@).  Likewise, Aengaged
in business@ has been interpreted by Texas
courts to mean Aconducting,
prosecuting, and continuing business by performing progressively all the acts normally
incident thereto.@  York v. Dotson, 271 S.W.2d 347, 349
(Tex. Civ. App.CFort
Worth 1954, writ ref=d n.r.e.)
(emphasis added).  Acts that are Anormally
incident@ to a
business are logically those which are done Ain the
usual and regular course.@  The language used by the Legislature
reasonably could be interpreted to mean continuing to carry on at least one
business that had been conducted before the asset sale.  

On the other hand, Arnold White
& Durkee asserts that article 5.09(B) does not require that the corporation
continue in any pre-sale business for the asset sale to be in the usual and
regular course of the corporation=s
business.  Rather, Arnold White &
Durkee argues that as long as the corporation still exists and engages in any
business whatsoever, then the sale must be considered in the Ausual and
regular course,@ as
defined in article 5.09(B).  This
interpretation is also reasonable because Acontinue
to engage in one or more businesses@ could be
interpreted less literally to mean continuing to engage in any business,
regardless of whether the corporation had engaged in that business before the
asset sale.








Furthermore, in discerning the
meaning of the first part of article 5.09(B), we should consider it in the
context of the entire provision.  See
City of San Antonio v. City of Boerne, 111 S.W.3d 22, 25 (Tex. 2003)
(stating that court interpreting a statute should read the statute as a whole
and interpret it to give effect to the entire statute).  Notably, under the second part of this
statute (the part of article 5.09(B) not italicized above), it seems clear that
application of a portion of the consideration received for the asset sale to the
Aconduct
of a business@ would qualify as falling within
the Ausual and
regular course of business@  for any business in which the
corporation engaged following the sale. 
The lack of restriction in this related part of article 5.09(B) strongly
suggests that the Legislature did not intend to impose such a requirement in
this statute.  

When there are at least two
reasonable interpretations of the statute at issue, the provision is ambiguous,
and we can and should properly rely on extratextual sources to determine its
meaning.  See In re Mo. Pac. Ry. Co.,
998 S.W.2d at 217.  Because there is an
ambiguity in article 5.09(B), we must apply the recognized rules of statutory
construction to determine the meaning of this provision.

Does article 5.09(B)
require the corporation to continue in at least one business that it conducted
before the asset sale?








In construing article 5.09(B), we
should consider the Legislature=s
objectives in enacting this statute, the circumstances under which the statute
was enacted, and the statute=s legislative
history.[4]
 See Helena Chem. Co. v. Wilkins,
47 S.W.3d 486, 493 (Tex. 2001).  In
addition, we should consider former law and similar statutory provisions as
well as the consequences of the different statutory constructions under
consideration.  See id.  In doing so, we must presume that the
Legislature intended the entire statute to be effective and intended a just and
reasonable result.  See id.

1.         The Purpose of the Appraisal Remedy and Shareholder
Approval Requirement

Minority shareholders are
vulnerable to abuse by the majority.  See
Barry M. Wertheimer, The Shareholders=
Appraisal Remedy and How Courts Determine Fair Value, 47 Duke L.J. 613 (1998).  In the context of a proposed sale of all or
substantially all of a corporation=s assets
not in the usual and regular course of the corporation=s
business, many states, including Texas, protect the minority shareholders by
requiring that such a transaction be approved by an affirmative vote of the
shareholders and by providing for an appraisal remedy for shareholders who do
not vote for such a transaction, if the transaction is nonetheless approved.  See, e.g., Tex. Bus. Corp. Act art. 5.10B5.12.  

The common law required unanimous
shareholder consent for fundamental corporate changes.  See Voeller v. Neilston Warehouse Co.,
311 U.S. 531, 536 n.6, 61 S. Ct. 376, 378 n.6, 85 L. Ed 322 (1941).  The common law thus allowed minority
shareholders to arbitrarily block corporate changes in an attempt to gain some
concession from the majority or to force a purchase of their shares at a
premium.  See id.  When states abandoned the common-law rule in
favor of statutes allowing approval of such actions by fewer than all of the
shareholders, this change in the law mitigated the ability of minority
shareholders to engage in nuisance or obstructionist behavior; however, it left
them vulnerable to oppression by the majority. 
See id.; Wertheimer, 47 Duke
L.J. at 614B15.  As a quid pro quo to protect minority
shareholders, states provided a statutory appraisal remedy.  See Voeller, 311 U.S. at 536 n.6, 61
S. Ct. at 378 n.6; Wertheimer, 47 Duke
L.J. at 614B15.  Another purpose of the appraisal remedy is to
allow shareholders to liquidate for fair value their investment in a
corporation that is changing to a significantly different business, in which
the shareholders do not wish to invest.  See
Wertheimer, 47 Duke L.J. at
615.  The appraisal remedy provides
minority shareholders a way to liquidate an investment that is being
significantly altered against their wishes. 
See id.  








2.         The Model Business Corporation Act and
Statutes Similar to the Texas Business Corporation Act

In construing article 5.09(B), it
is also appropriate to consider former statutory provisions and other statutes
on the same or a similar subject.  See
Bass v. Walker, 99 S.W.3d 877, 885 n.4 (Tex. App.CHouston
[14th Dist.] 2003, pet. denied).  As the
majority notes, the Texas Business Corporation Act is based on the Model
Business Corporation Act.  Republic
Nat. Bank of Dallas v. Whitten, 383 S.W.2d 207, 212 (Tex. App.CDallas
1964), aff=d, 397
S.W.2d 415 (Tex. 1965); see also
Model Bus. Corp Act (1999 Supp.). 
Although article 5.09(B) was not taken from the Model Business
Corporation Act, this court should still consider the statutory framework of
the shareholder-approval requirement and the appraisal remedy of the Texas
Business Corporation Act and recognize that these provisions are based on the
Model Business Corporation Act.  See
Tex. Bus. Corp. Act art. 5.10B5.12, Model Bus. Corp Act '' 12.01,
12.02, 13.02 (1999 Supp.).  Under both
Texas law and the Model Act, shareholder approval and the appraisal remedy
apply when a corporation sells all or substantially all of its assets other
than in the usual and regular course of its business.  See Tex.
Bus. Corp. Act art. 5.10B5.12, Model Bus. Corp Act '' 12.01,
12.02, 13.02 (1999 Supp.).  








The relevant Official Comment to
the Model Act gives the following examples of the narrow circumstances under
which it would be in the usual and regular course of a corporation=s
business to sell all of its assets: (1) Athe sale
of a building that was the corporation=s only
major asset where the corporation was formed for the purpose of constructing
and selling that building,@ or (2) Athe sale
by a corporation of its only major business where the corporation was formed to
buy and sell businesses and the proceeds of the sale are to be reinvested in
the purchase of a new business . . . .@  See Model
Bus. Corp Act ' 12.01
(1999 Supp.) (official cmt.).  Decisions
from other jurisdictions indicate that corporations sell all or substantially
all of their assets in the Ausual and
regular course@ of their business only if
the corporation=s
business is to buy and then sell real estate, businesses, or other investments
so that it is anticipated that the corporation, at one or more points, will
sell all or substantially all of its assets. 
See Sutherland v. Kaonohi Ohana, Ltd., 776 F.2d 1425, 1427 (9th
Cir. 1985) (applying Hawaii law and holding that sale of corporation=s only
assetCa piece
of real estateCwas in the ordinary course of the
corporation=s business because the
corporation was formed for the purpose of selling this asset); Huntsville
Indus. Assocs., Inc. v. Cummings, 295 So.2d 251, 255 (Ala. 1974) (stating that
sale of all or substantially all of corporation=s assets
occurs in Ausual and regular course of
business@ when the
inherent nature of the corporation=s
business and the methods used to conduct that business are such that the
corporation in the normal course of events sells all or substantially all of
its assets and holding that sale in question was not in the usual and regular
course of business because the corporation=s
business was to rent real estate); Vig v. Deka Realty Corp., 143 A.D.2d
185, 186B87 (N.Y.
App. Div. 1988) (holding sale of only significant asset was not in usual or
regular course of corporation=s
business because corporation was in the business of managing the real-estate
asset in question not in the business of selling it). 

In 1987, the Texas Legislature
enacted a unique definition of  Ausual and
regular course of business@ that is
not used in any other state.  The only
other jurisdiction with similar language in its corporate code is Louisiana,
although Louisiana does not use the concept of 
Ausual and
regular course of business@ in
determining whether shareholders= approval
is required or whether the appraisal remedy is available.  See La.
Rev Stat. Ann. ' 121
(E).  In establishing this unusual
statutory definition in article 5.09(B), the Texas Legislature may not have
intended Ausual and regular course of
business@ to have
the common-law meaning that has been adopted by courts under the Model Act;
nonetheless, it is appropriate for this court, in construing the meaning of the
words, to consider the structure of the Texas Business Corporation Act and
similar statutes at the time the Legislature enacted article 5.09(B).  See Helena Chem. Co., 47 S.W.3d at
493; Bass, 99 S.W.3d at 885 n.4. 
A review of these contrasting statutes suggests the Texas Legislature
intended a major departure in the definition of Ausual and
regular course of business.@








3.         Legislative History

As part of its analysis of the
legislative history, the majority relies on statements made about article
5.09(B) in 1996 by a committee of the State Bar of Texas.[5]  Though this learned committee may have been
studying the Texas Business Corporation Act and making recommendations
concerning it, the Texas Legislature did not change article 5.09(B) based on
anything this committee did in 1996. 
There is no indication that this committee had the same membership as
the committee that proposed the addition of article 5.09(B) in 1987.  The statements on which the majority relies
were not made by legislators, and they were made nearly a decade after the
enactment of article 5.09(B).  Therefore,
these statements, which the majority calls Athe 1996
comment to article 5.09,@ are
neither legislative history nor relevant to the statutory-construction issue at
hand.  See Chair King, Inc. v. GTE
Mobilnet of Houston, Inc., 135 S.W.3d 365, 380 (Tex. App.CHouston
[14th Dist.] 2004, pet. filed) (holding post-enactment statements by
nonlegislators are irrelevant to interpretation of ambiguous statute); see
also Sullivan v. Finkelstein, 496 U.S. 617, 631, 110 S. Ct. 2658, 2667, 110
L. Ed. 2d 563 (1990) (Scalia, J., concurring in part) (stating that Apost‑enactment
legislative history@ is an
oxymoron and should not be considered in interpreting statutes and that even
the proponents of its use limit it to statements from members of the
legislative body that enacted the statute). 
Similarly, statements made by two of the members of the 1987 State Bar
of Texas committee in an article published after the enactment of article
5.09(B) are not relevant legislative history, although the majority cites this
article as additional support for its position.[6]








The majority, however, properly
considers the Bill Analysis from the House Committee on Business and
Commerce.  This analysis states that
article 5.09(B) contains language similar to section 121(E) of the Louisiana
Revised Statutes in an attempt to respond to cases in other jurisdictions that
have interpreted a sale of Aall or
substantially all@ of a
corporation=s assets too broadly.  This legislative history states that Ashareholder
approval is not required if a corporation engages in a business or applies any
assets received from a sale in the business of the corporation.@  See House
Comm. On Bus. & Comm, Bill Analysis, Tex. H.B. 418, 70th Leg., R.S.
(1987).  Though this legislative history
can be read as favoring Arnold White & Durkee=s position,
it does not specifically address whether the business engaged in after the
asset sale can be a completely different one or has to be one of the businesses
conducted before the transaction. 
Therefore, as to the issue in this case, the legislative history is not
particularly clear, though it does seem to support Arnold White & Durkee=s
position.  

4.         The
Consequences of the Possible Constructions and Legislative Intent

In
considering the potential consequences of the possible constructions, it is
significant that the Shareholders=
construction of the statute would serve the goal stated in the legislative
history of avoiding an overly broad view of which asset-sale transactions
trigger the statutory protections.  If
construed as requiring that the corporation continue in one of its prior
businesses, article 5.09(B) would still prevent shareholder approval and the
appraisal remedy from applying to many corporate transactions that otherwise
might arguably require shareholder approval because the assets sold were
crucial assets or an important business of the corporation. 








Conversely, Arnold White &
Durkee=s
construction of article 5.09(B) would effectively eviscerate the appraisal
remedy and shareholder-approval protections for shareholders of Texas
corporations, providing the sale of assets was structured in a certain
way.  See Tex. Bus. Corp. Act art. 5.10B5.13.  Arguably, all the board of directors of a
corporation would have to do to avoid these statutory shareholder protections
is to arrange for the corporation to continue in some businessCeven
though very different from the corporation=s prior
businessesCso that the corporation can Aengage in
a business@ after the sale of all or
substantially all of the corporation=s
assets.  Given the relative ease of
structuring a transaction in this manner, a corporation in Arnold White &
Durkee=s
position could avoid triggering the statutory shareholder protections, leaving
minority shareholders vulnerable to fundamental corporate change without
shareholder approval or an appraisal remedy for dissenting shareholders.  Though this construction of article 5.09(B)
would not completely eliminate the statutory protections available to
shareholders, it would seriously limit the circumstances in which they would
apply. 

While we presume the Legislature,
in enacting article 5.09(B), intended a just, fair, and reasonable result, our
overriding goal in construing this statute is to give effect to the Legislature=s
intent.  See City of San Antonio,
111 S.W.3d at 25 (stating that, in construing a statute, a court=s
objective is to give effect to the Legislature=s
intent); Young v. Del Mar Homes, 608 S.W.2d 804, 807 (Tex. Civ. App.CHouston
[14th Dist.] 1980, writ ref=d n.r.e.)
(stating courts should not adopt a statutory construction that is based on a
presumption that the Texas Legislature intended an unfair, unjust, or unreasonable
result).  Despite the history and
structure of the Texas Business Corporation Act, the legislative history
indicates the Legislature intended to adopt a much broader definition of Ausual and
regular course of business@C one that
is far more expansive than the counterpart in the Model Act and that is unlike
any definition recognized in Texas case law. 
Further, article 5.09(B) does not unequivocally require that the
corporation continue forward in at least one business it conducted pre-sale,
and the second part of article 5.09(B) indicates just the opposite.  See Tex.
Bus. Corp. Act art. 5.09(B). 
Having considered article 5.09(B)=s
language, individually and in the context of the entire provision, together
with the statutory framework of the Texas Business Corporation Act, the
purposes of the appraisal remedy and shareholder-approval requirement regarding
sales of all or substantially all of a corporation=s assets,
the legislative history, and the consequences that would follow from the
possible constructions of article 5.09(B), this statute should be construed as
requiring that the corporation continue in some business after the asset sale,
without regard to whether the corporation engaged in that business before the
asset sale.  








Arnold White & Durkee
continued to engage in business after the asset sale and so that sale is deemed
to be in the Ausual and regular course@ of the
corporation=s business under the Legislature=s unique
definition of that term in article 5.09(B). Because shareholder approval is not
required for such a transaction, the consequences of this statutory
construction may seem  like a harsh
treatment of the Shareholders, who did not approve of such a fundamental
corporate change in their law firm.  This
result, however, is compelled by the unusual definition in this statute, unique
to Texas law. 

In enacting article 5.09(B), the
Texas Legislature made a decision to severely limit the statutory protections
afforded shareholders and to greatly diminish the rights and remedies available
to them under former law.  Because the
statute affords corporations enormous latitude in making fundamental corporate
changes without shareholder approval, the consequences may seem unfair or unjust
to dissenting shareholders.  But it is
the Legislature=s
prerogative to make these policy choices. 
This construction of article 5.09(B) simply reflects the Legislature=s intent.

Is it necessary to
determine whether Arnold White & Durkee continued in the legal services
business?








The majority finds that Arnold
White & Durkee continued in the legal services business that it conducted
pre-sale.  This issue is certainly
subject to debate.  Arnold White &
Durkee used to be a law firm.  Its only
business was the practice of law and its only purpose was to perform legal
services on behalf of clients.  It is no
longer engaged in the practice of law,[7]
and it no longer hasCor even
seeksCclients.[8]  Arnold White & Durkee is merely an
interest holder in a new entity that engages in the practice of law.  Whether obtaining and holding a partnership
interest such as that held by Arnold White & Durkee in the newly created
firm of Howrey Simon Arnold & White, L.L.P. constitutes Adirectly
or indirectly engaging in the legal services business,@ as the
majority concludes, is an interesting issue but one that this court need not
reach.[9]

Conclusion








The Texas Legislature has adopted a peculiar definition of Ausual and
regular course of business@ in
article 5.09(B) not utilized in any other jurisdiction or recognized at common
law.  Under this unique definition, a
corporation=s sale of all or substantially
all of its assets is in the Ausual and
regular course of business@ as long
as the corporation continues in businessCany
businessCafter the
sale.  Arnold White & Durkee
continued in business after the sale. 
Accordingly, the trial court did not err in granting summary judgment
based on Arnold White & Durkee=s
assertion that the asset sale was in the usual and regular course of its
business under article 5.09(B), and therefore, shareholder approval of the
transaction was not required.  Moreover,
because the statutory shareholder protections in articles 5.10 and 5.12 were
never triggered, the Shareholders have no appraisal remedy.

 

/s/        Kem Thompson Frost

Justice

 

 

Judgment rendered and Majority and
Concurring Opinions filed September 30, 2004.

 

Panel consists of Chief Justice Hedges and
Justices Frost and Guzman.  (Hedges,
C.J., majority.)

 

 











[1]  See Tex. Bus.
Corp. Act art. 5.10.





[2]  See id., art. 5.12.





[3]  See Tex. Bus.
Corp. Act art. 5.09(B).





[4]  Although the
Code Construction Act does not apply to the Texas Business Corporation Act, the
relevant common-law principles for construing the statute in this case are the
same as those stated in the Code Construction Act.  See Tex.
Gov=t Code Ann. ' 311.002 (Vernon 1998) (stating that Code Construction
Act applies only to (1) code enacted by 60th or subsequent Legislature, (2)
amendment, repeal, revision, or reenactment of such a code, (3) repeal of a
statute by a code, and (4) a rule adopted under a code); Dodd v. State,
650 S.W.2d 129, 130 (Tex. App.CHouston [14th Dist.] 1983, no pet.) (applying same
principle as that stated in Code Construction Act to statute that court
acknowledged was not covered by Code Construction Act); Harris Cty.
v. Suburban Utility Co., 547 S.W.2d 72, 74 (Tex. Civ. App.CHouston [1st Dist.] 1977, no writ) (holding that Code
Construction Act did not apply to statute at issue because that statute was not
a code).





[5]  See
maj. op., ante at pp. 4B6. 





[6]  See
maj. op, ante at n.5.





[7]  Arnold White
& Durkee=s remaining attorneys (shareholders and employees) no
longer practice law under the auspices of Arnold White & Durkee, but
instead hold themselves out as lawyers in Howrey Simon.  Since the effective date of the combination,
Arnold White & Durkee  has been
nothing more than a passive partner in Howrey Simon.  Moreover, there will never be new
shareholders in Arnold White & Durkee, and as existing shareholders retire,
withdraw, or otherwise terminate their relationship, Arnold White & Durkee=s partnership interest in Howrey Simon is reduced by
the same percentage as the departing shareholder=s equity
interest in Arnold White & Durkee. 
Eventually, Arnold White & Durkee=s
partnership interest in Howrey Simon will evanesce altogether.  Arnold White & Durkee currently has no
source of income other than what it receives as a Howrey Simon partner.  





[8]  Arnold White
& Durkee does not market itself as a law firm or carry malpractice
insurance. Its few remaining shareholders practice solely on behalf of Howrey
Simon and Howrey Simon clients.  The
majority finds that Arnold White & Durkee needs no more than lawyers
themselves to engage in the legal-services business.  The record shows that when Arnold White &
Durkee  had clients, the firm used a
great deal more than lawyers to engage in the legal-services business,
including leasehold interests, books, computers, furniture, equipment, and many
other operating assets.  Though it may be
technically possible to engage in the legal-services business with no operating
assets, as the majority suggests, Arnold White & Durkee clearly did not do
so before the asset transfer, when the firm still had clients.  With no Atools of
the trade@ it would seem that the firm=s few remaining lawyers and support staff would be
ill-equipped to service clients even if there were some.  Likewise, with no clients to consume legal
services, it is questionable whether Arnold White & Durkee could, directly
or indirectly, continue in the legal-services business.  

 





[9]  In some parts
of its opinion, the majority also indicates that the applicable legal standard
requires an inquiry into whether Arnold White & Durkee continued to exist
as a corporation or is still a viable corporation after the sale.  Although corporate existence  is required to conduct business, corporate
existence, by itself, is not sufficient to constitute doing business.  In any event, the applicable statute does not
require this court to determine whether Arnold White & Durkee continued to
exist as a corporation or is still a 
viable corporation after the sale. 
We are to determine whether it continued in business after the sale.